FILED

2007 JAN 11  AM 11: 53

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ALASKA LABORERS EMPLOYERS RETIREMENT FUND, On Behalf of Itself and All Others Similarly Situated and Derivatively on Behalf of CLEAR CHANNEL COMMUNICATIONS, INC., | § § § § § | Civil Action No.

CLASS AND DERIVATIVE ACTION

SA07CA0042 RF |
| Plaintiff, | § § § | |
| vs. | § § | |
| L. LOWRY MAYS, MARK P. MAYS, RANDALL T. MAYS, BILLY JOE MCCOMBS, PHYLLIS B. RIGGINS, THEODORE H. STRAUSS, J.C. WATTS, JR., JOHN H. WILLIAMS, JOHN B. ZACHRY, ALAN D. FELD, PERRY J. LEWIS, THOMAS H. LEE PARTNERS, L.P., BAIN CAPITAL PARTNERS, LLC, B. TRIPLE CROWN FINCO, LLC, T. TRIPLE CROWN FINCO, LLC and BT TRIPLE CROWN MERGER CO., INC., | § § § § § § § § § § § § § § § | |
| Defendants, | § § § | |
| – and – | § § | |
| CLEAR CHANNEL COMMUNICATIONS, INC., a Texas corporation, | § § § | |
| Nominal Defendant. | § § | |

**SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS AND SUPPLEMENTAL
STATE LAW CLAIMS**

## INTRODUCTION

1.      This is a shareholder class and derivative action brought on behalf of Clear Channel Communications, Inc. ("CCU" or the "Company") and its public shareholders against its entire Board of Directors for violations of federal and state law, including breach of fiduciary duty and related misconduct arising out of a proposed buyout of CCU (the "Proposed Transaction") pursuant to a defective process, and on unfair and inequitable terms, whereby the Company's founding family and senior executives, L. Lowry Mays, Mark P. Mays and Randall T. Mays (the "Mays Family"), together with an investor group consisting of defendants Thomas H. Lee Partners, L.P. ("THL") and Bain Capital Partners, LLC ("Bain") (collectively, the "Buyout Group") are attempting to squeeze CCU's public shareholders' out of their equity holdings in the Company, while simultaneously providing CCU insiders and directors with tens of millions of dollars of special benefits and saddling the Company with billions of dollars of additional debt.

## SUMMARY OF THE ACTION

2.      On November 16, 2006, defendants caused CCU to announce the Proposed Transaction which provides that the Buyout Group will acquire 100% of the outstanding equity of CCU for $37.60 per share.   Defendants have structured the Proposed Transaction to ensure that the Mays Family will: (i) reap hundreds of millions of dollars worth of change-of-control payments; (ii) continue to be employed at CCU; and/or (iii) continue to exercise control over CCU's valuable assets and future prospects. And, to ensure the complicity of each member of CCU's Board of Directors, the Buyout Group also agreed to provide each CCU director with complete indemnification for all claims and litigation arising out of the wrongdoing complained of herein.

3.      The process undertaken by CCU's management and Board of Directors to sell the Company was led by the Mays Family and was fundamentally flawed from its inception.  Defendants subverted the sale process by, among other things: (i) purposefully and arbitrarily limiting the time period during which interested parties could make bids; (ii) refusing to give good faith consideration to proposals that did not acquiesce to the Mays Family's demands concerning employment and continued ownership and control; and (iii) failing to adequately and properly consider strategic alternatives which were beneficial to CCU and its public shareholders, but did not provide special benefits to the Mays Family.  In fact, at least two bidders for CCU were rejected for their failure to acquiesce to the demands of the Mays Family to remain as CCU's managers.  At least one bidder was dissuaded from submitting a bid due to defendants' insistence on a unreasonably short three-week window for making bids on one of the largest leveraged buyouts in U.S. history.

4.      To immunize themselves from liability for their misconduct, the CCU Board created the so-called "special advisory committee," a subcommittee of purportedly disinterested CCU directors tasked with protecting the interests of CCU and its public shareholders by overseeing the sale process.  The special advisory committee was, however, neither empowered nor independent as each member of the special advisory committee was hand-picked by the Mays Family for service on the CCU Board and the majority had close personal and/or business ties to the Mays Family.  In furtherance of their efforts to immunize themselves from liability for their misdeeds, defendants also included in the merger agreement a post-announcement "solicitation period," even though defendants knew it was ineffective because any party coming forward with a

2

proposal would be taxed an additional $300 million payable to the Buyout Group *just to have the opportunity to make a superior offer for CCU*.

5.     In furtherance of these efforts to induce shareholder approval, defendants have prepared and filed with the Securities and Exchange Commission ("SEC") a Proxy Statement that is false and misleading in that it omits and/or misrepresents material facts, including that, as a condition to the sale of CCU, the Mays Family required that they be able to continue to have an equity ownership interest in the post-acquisition CCU entity. In purposefully subverting the interests of CCU and its shareholders in favor of their own interests, each of the defendants violated applicable federal and state law by preparing and filing a false Proxy Statement with the SEC and directly breaching and/or aiding the other defendants' breaches of their fiduciary duties of loyalty, candor, due care, independence, good faith and fair dealing.  While the Proxy Statement purports to disclose all material information concerning the background and negotiations leading to the Proposed Transaction, it fails to disclose material information regarding the Proposed Transaction, including, but not limited to, the refusal of the CCU Board to give good faith consideration to certain proposals and the special benefits defendants required to be paid to the Mays Family in connection with the sale of CCU.

6.     The Proposed Transaction is the product of a hopelessly flawed process that is designed to subvert the interests of CCU and its public stockholders and ensure the sale of CCU to the Buyout Group, on terms preferential to the Mays Family and other CCU insiders.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act [15 U.S.C. §78aa].  This Court also has

jurisdiction over this matter pursuant to 28 U.S.C. §1332(a)(2) in that plaintiffs and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs. This Court has supplemental jurisdiction under 28 U.S.C. §1367.

8.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

9.     Venue is proper in this District pursuant to 28 U.S.C. §1391, because nominal defendant CCU is headquartered in this District and thus a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this District. One or more of the defendants either resides in, or maintains executive offices in this District.

## THE PARTIES

10.     Plaintiff Alaska Laborers Employers Retirement Fund ("Alaska Laborers"), a citizen of Alaska, at all relevant times hereto has been a shareholder of CCU.

11.     Nominal party, CCU, is a corporation organized and existing under the laws of the State of Texas, with its principal executive offices located at 200 East Basse Road, San Antonio, Texas 78209. CCU operates as a diversified media company in two segments, Radio Broadcasting and Outdoor Advertising. As of December 31, 2005, the Company owned 1,182 radio stations and a radio network operating in the United States. The Outdoor Advertising segment owns or operates outdoor advertising display faces in the United States and internationally in Europe, Australia, Asia and Africa.

12.     Defendant L. Lowry Mays ("L. Mays"), a citizen of Texas, is the founder of CCU and currently serves as Chairman of the Company's Board of Directors. Prior to October of 2004, L. Mays served as Chairman and Chief Executive Officer ("CEO") of CCU.   L. Mays is a director of CCU's publicly traded subsidiary, CCU Outdoor Holdings, Inc.  L. Mays is the father of Mark P. Mays ("M. Mays") and Randall T. Mays ("R. Mays"), who serve as the CEO, and the President and Chief Financial Officer ("CFO"), respectively, of CCU.  Defendant L. Mays may be served at 500 Alameda Circle, San Antonio, TX 78212.

13.     Defendant M. Mays, a citizen of Texas, is a member of CCU's Board of Directors and currently serves as the Company's CEO.  M. Mays was CCU's President and Chief Operating Officer ("COO") from February 1997 until his appointment as the Company's President and CEO in October 2004.  M. Mays resigned as President of CCU in February 2006.   M. Mays is also a director of the Company's publicly traded subsidiary, CCU Outdoor Holdings, Inc.  M. Mays is the son of L. Mays and the brother of R. Mays.  Defendant M. Mays may be served at 200 East Basse Road, San Antonio, TX 78209.

14.     Defendant R. Mays, a citizen of Texas, is a member of CCU's Board of Directors and currently serves as the Company's President and CFO.  R. Mays has served as a director since April 1999.  R. Mays was appointed Executive Vice President and CFO of CCU in February 1997, and was appointed Secretary in April 2003.  R. Mays was appointed President in February 2006.  R. Mays is also a director of the Company's publicly traded subsidiary, CCU Outdoor Holdings, Inc.  R. Mays is the son of L. Mays

and the brother of M. Mays.  Defendant R. Mays may be served at 200 East Basse Road, San Antonio, TX 78209.

15.     Defendant Billy Joe McCombs ("McCombs"), a citizen of Texas, is a member of CCU's Board of Directors and has served as a director since the Company went public in 1984.  McCombs has worked closely with L. Mays since CCU was founded in 1972.  The Mays and McCombs families have decades of longstanding, personal, financial and social ties.  The Company pays almost $17,000 per month to lease office space from a partnership that is owned by separate entities for the Mays and McCombs children.  During 2004, the McCombs joined together with L. Mays and his wife Peggy to establish and fund the Red and Charline McCombs Institute for the Early Detection and Treatment of Cancer at the University of Texas, MD Anderson Cancer Center.  In 2005, the Mayses contributed $20 million to this Institute.  Each of the Mays defendants also serve on the board of Live Nation, Inc., where McCombs' daughter, Connie McCombs McNab, also serves as a director.  Defendant McCombs may be served at 825 Contour Drive, San Antonio, TX 78212.

16.     Defendant Phyllis B. Riggins ("Riggins"), a citizen of Texas, has served as a member of CCU's Board of Directors since December 2002.  Defendant Riggins may be served at 3412 St. Johns Drive, Highland Park, TX 75205.

17.     Defendant Theodore H. Strauss ("Strauss"), a citizen of Texas, has served as a member of CCU's Board of Directors since the Company went public in December 1984.  Strauss's brother, Bob Strauss, is a partner at Akin Gump Strauss Hauer & Feld ("Akin Gump").   Akin Gump, at the request of the Mays Family and CCU's management, has performed millions of dollars of legal services for defendants and/or

CCU.  Akin Gump was intimately involved in structuring and negotiating the Proposed Transaction, and purported to advise the Board of Directors of CCU of their duties to CCU and CCU's public shareholders in connection with the Proposed Acquisition. Defendant Strauss may be served at 5914 Desco Drive, Dallas, TX 75225.

18.     Defendant J.C. Watts, Jr. ("Watts"), a citizen of Virginia, has served as a member of CCU's Board of Directors since February 2003.  Defendant Watts may be served at 3512 Rose Crest, Fairfax, VA 22030.

19.     Defendant John H. Williams ("Williams"), a citizen of Texas, has served as a member of the Company's Board of Directors since the Company went public in 1984.  Defendant Williams has a decade long personal relationship with L. Mays. Defendant Williams attended Harvard Business School with L. Mays and helped underwrite the Company's Initial Public Offering when he was a banker at Dallas-based Schneider, Bernet & Hickman.  Defendant Williams may be served at 4737 Lafayette Avenue, Fort Worth, TX 76107.

20.     Defendant John B. Zachry ("Zachry"), a citizen of Texas, has served as a member of the Company's Board of Directors since December 2005.  Defendant Zachry serves with R. Mays on the Board of Trustees of San Antonio Academy, an exclusive boys' school.  Zachry and defendant McCombs have also worked together in providing financial support to political candidates in recent years.  In addition, Zachry, along with defendants L. Mays, M. Mays and McCombs, are all members of the United Way San Antonio Board of Trustees.  Defendant Zachry may be served at 334 Geneseo Road, San Antonio, TX 78209.

21.     Defendant Alan D. Feld ("Feld"), a citizen of Texas, has served as a director of CCU since 1984.  Feld is the sole shareholder of a professional corporation which is a partner in the law firm of Akin Gump, a law firm which has extensive relationships with the Mays and CCU as detailed in ¶¶17 and 24 hereto.  Feld attended Highland Park High School in Dallas with L. Mays.  Defendant Feld may be served at 4235 Bordeaux Ave., Dallas, TX 75205.

22.     Defendant Perry J. Lewis ("Lewis"), a citizen of Connecticut, has served as a member of CCU's Board of Directors since August 30, 2000.  Defendant Lewis may be served at 183 Great Hill Road, Ridgefield, CT.

23.     The individual defendants named above in ¶¶12-22 are sometimes referred to herein as the "Individual Defendants."  The Mays Family owns approximately 7% of the Company and effectively controls the Company's operations.  The vast of majority, if not all, of the members of CCU's 11-seat Board have close business and personal relationships with the Mays Family.  For example, defendant McCombs and the Mays Family have close business and personal ties.  The Company pays almost $17,000 per month to lease office space from a partnership that is owned by separate entities for the Mays and McCombs children.  Further, according to an article in *The Wall Street Journal* article dated November 14, 2006 (the "WSJ article"), "[l]ast year, the McCombs donated $30 million to the University of Texas to establish the Red and Charline McCombs Institute for the Early Detection and Treatment of Cancer.  Soon thereafter, L. Mays and his wife, Peggy, contributed $20 million to support the new institute."

24.     The WSJ article also describes the relationship between the Mays Family and numerous other directors:

Besides Mr. McCombs, three other directors have been on the board ever since the company went public. Mr. Feld attended Highland Park High School in Dallas with Mr. Mays and was an early partner at the law firm of Akin Gump Strauss Hauer Feld LLP, which has long done legal work for CCU.

Mr. Mays's Harvard Business School classmate, John Williams, helped underwrite the company's IPO when he was a banker at Dallas-based Schneider, Bernet & Hickman. Ted Strauss, the brother of Democrat stalwart and Akin Gump partner Bob Strauss, is a former banker at Bear Stearns & Co.

\*       \*       \*

Among the recent board appointees is John Zachry, chief executive of San Antonio-based Zachry Construction Corp. Mr. Zachry currently serves with Randall Mays on the board of trustees of San Antonio Academy, an exclusive boys' school.

25.     Defendant Bain, a citizen of Massachusetts, is a global private investment firm that manages several pools of capital, including private equity, high-yield assets, mezzanine capital and public equity with more than $40 billion in assets under management. Headquartered in Boston, Massachusetts, Bain has offices in New York, London, Munich, Tokyo, Hong Kong and Shanghai. Defendant Bain may be served at 111 Huntington Avenue, Boston, MA 02199.

26.     Defendant THL, a citizen of Massachusetts, is a private equity investment firm and currently manages approximately $20 billion of committed capital. THL's principal executive offices are located in Boston, Massachusetts. Defendant THL may be served at 100 Federal Street, 35th Floor, Boston, MA 02110.

27.     Defendants Bain and THL, along with the Mays Family, are sometimes collectively referred to herein as the "Buyout Group."

28.     Defendant B Triple Crown Finco, LLC ("BTCF"), a citizen of Massachusetts, is a limited liability company organized solely for the purpose of entering

into the Merger Agreement and consummating the transactions contemplated by the Merger Agreement. BTCF is currently wholly-owned by Bain Fund IX (an entity controlled by Bain) and it can be served at its principal executive office located at 111 Huntington Avenue, Boston, MA 02199.

29.    Defendant T Triple Crown Finco, LLC ("TTCF"), a citizen of Massachusetts, is a limited liability company organized solely for the purpose of entering into the Merger Agreement and consummating the transactions contemplated by the Merger Agreement.  TTCF is currently wholly-owned by THLee Fund VI (an entity controlled by THL) and it can be served at its principal executive office is located at 100 Federal Street, Boston, MA 02110.

30.    Defendant BT Triple Crown Merger Co., Inc. ("BT Triple Crown"), a citizen of Delaware and Massachusetts, is a corporation organized solely for the purpose of entering into the Merger Agreement and consummating the transactions contemplated by the Merger Agreement.  Under the terms of the Merger Agreement, BT Triple Crown will merge with and into the Company.  The Company will survive the Merger and BT Triple Crown will cease to exist.  BT Triple Crown can be served at its principal executive offices located at 100 Federal Street, Boston, MA 02110.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

31.    The Individual Defendants, as officers and/or directors of CCU, have a fiduciary relationship and responsibility to plaintiff and the other  public stockholders of CCU, and owe to plaintiff and other Class members the highest obligation of good faith, loyalty, fair dealing, due care, and candor.

32.    Each of the Individual Defendants is obligated to act in good faith, in the best interests of the Company and is shareholders, and with such care, including

reasonable inquiry, as would be expected of an ordinarily prudent person.  In a situation where the directors of a publicly traded company undertake a transaction that may result in a change in corporate control, the applicable law mandates the directors to take all steps reasonably required to:  (i) maximize the value shareholders will receive rather than use a change of control to benefit themselves, and (ii) to disclose all material information concerning the proposed change of control in order to enable the shareholders to make an informed voting decision.   To diligently comply with this duty, the directors of a corporation may not take any action that:

     (a)    adversely affects the value provided to the corporation's shareholders;

     (b)    contractually prohibits them from complying with or carrying out their fiduciary duties; or

     (c)    will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders.

     33.    As described herein, the Individual Defendants have breached and are breaching their fiduciary duties in a willful, reckless and wanton manner by taking actions designed to ensure that the Mays Family, along with the other members of the Buyout Group, acquire the Company and its future potential on terms preferential to the Mays Family and that are harmful to CCU and/or its public stockholders.  The Individual Defendants have, with recklessness, breached, and continue to breach their fiduciary obligation to act reasonably.

34.     The Mays Family founded the Company and controls its Board of Directors and owes fiduciary duties of good faith, fair dealing, loyalty, candor, and due care to plaintiff and the other members of the Class.

## DERIVATIVE ALLEGATIONS

35.     Plaintiff brings Counts I-V pursuant to Rule 23.1 of the Federal Rules of Civil Procedure, derivatively in the right and for the benefit of CCU to redress injuries that have been suffered and are continuing to be suffered by CCU as a direct result of the defendants' violations of law.  CCU is named as a nominal party in this derivative action solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

36.     Plaintiff will adequately and fairly represent the interests of CCU in enforcing and prosecuting its rights, and has retained counsel experienced and competent in litigating complex actions and shareholder litigation.

37.     Plaintiff is the owner of CCU stock and was the owner of CCU stock during the time relevant to defendants' illegal and wrongful course of conduct alleged herein.

38.     Demand was made pursuant to Tex. Bus. Corp. Act art. §5.14.  A true and correct copy of plaintiff's demand is attached hereto as Exhibit A.  Defendants L. Mays, M. Mays, R. Mays, McCombs, Riggins, Strauss, Watts, Williams, Zachry, Feld and Lewis controlled the Company and its actions both prior to and after said statutory demand was made.  Despite said demand, each of the defendants failed to respond as directed and are continuing to take steps to consummate the Proposed Transaction which are resulting in irreparable harm to the Company and the Individual Defendants.

39.     Each of the members of the CCU Board of Directors have directly participated in the wrongs complained of herein, which disables them from acting independently, objectively or in good faith to advance the interests of CCU or respond to a demand by shareholders.  The Board and senior management are not disinterested or independent as detailed herein and set forth below:

(a)     Each of the Individual Defendants served on the CCU Board during the relevant period and as board members each was charged with oversight and operation of the Company and the conduct of its business affairs.  Each of the Individual Defendants has breached the fiduciary duties owed to CCU and its shareholders by, among other things, failing to take reasonable steps to protect and achieve the interests of CCU and its public shareholders.

(b)     Even though certain Individual Defendants claim to be independent directors because the Company does not directly employ them, none of these directors are truly independent and have demonstrated their alignment with the Mays Family by supporting each and every course of action favored by them, including voting to recommend the Proposed Transaction to shareholders.

(c)     The Individual Defendants participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from CCU's shareholders or recklessly and/or negligently disregarded the wrongs complained of herein.  Its members are, therefore, not disinterested parties.

40.     The Individual Defendants have not exercised and cannot exercise independent or objective judgment in deciding whether to bring this action or whether to

vigorously prosecute this action because each of the Individual Defendants has participated in and/or acquiesced to the misconduct alleged herein.

41.   The members of the CCU Board of Directors have demonstrated their unwillingness to act in compliance with federal or state law or sue themselves and/or their fellow directors and allies in the top ranks of the corporation for failure to do so, as they have developed professional relationships with their fellow board members who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

42.   CCU's senior insiders and directors named as defendants herein have shown their interests to be antagonistic to CCU and this lawsuit as they have refused to maximize value for CCU and its shareholders.  The members of the CCU Board of Directors have not and will not authorize a suit against themselves as such a suit would require these Individual Defendants to expose themselves to a huge personal liability to CCU, as, due to the particular language of currently utilized directors' and officers' liability insurance policies (i.e., the insured vs. insured exclusion), such an action would not be an insured claim.

43.   The underlying misconduct of Individual Defendants is not a product of a valid exercise of business judgment, and can not be properly ratified by the CCU Board of Directors.

### SUBSTANTIVE ALLEGATIONS

44.   During the five years prior to the announcement of the Proposed Transaction, the Mays Family came under severe criticism for purportedly causing billions of dollars of lost shareholder value due to their mismanagement of CCU.  The

criticism included the Board's authorization of a $4.3 billion buyback to prop-up the price of CCU stock, which actions did little to improve the stock's price, and the Board's plan to sell shorter advertising blocks – dubbed the "less is more plan" – which failed to revitalize the Company's advertising margins.

**Background to the Proposed Acquisition**

45.    On August 18, 2006, defendants M. Mays and R. Mays contacted Goldman Sachs and requested Goldman Sachs to prepare a preliminary assessment of the strategic alternatives available to the Company, including a possible sale of the Company.

46.    Within two weeks, representatives of The Blackstone Group ("Blackstone") contacted defendants M. Mays and R. Mays and stated that Blackstone was interested in exploring the possible acquisition of CCU.  Thereafter, defendants M. Mays and R. Mays met with representatives of Blackstone and with representatives of Providence Equity Partners ("Providence") in San Antonio, Texas.  At these meetings, M. Mays and R. Mays separately discussed with representatives of these two private equity groups their respective views on the feasibility of a leveraged acquisition transaction of the Company.

47.    After several meetings, Blackstone and Providence, together with M. Mays and R. Mays, formed a single consortium (the "Blackstone/Providence Consortium") and submitted an all cash offer to acquire the Company for $34.50 per share.

48.    On September 25, 2006, at the request of the Mays Family, the Board convened a special meeting.  Defendants Feld, Lewis, Riggins, Strauss, Watts, Williams and Zachry approved taking steps to proceed with a sale of the Company.  The Individual Defendants also created a "special advisory committee," purportedly designed to

immunize defendants from personal liability for agreeing to sell CCU pursuant to a defective process, by arranging for defendants Lewis, Williams and Zachry to be charged with assessing the fairness of the terms of any leveraged buyout transaction or other proposal.

49.     In an effort to feign as if they were engaged in a good faith sale process, the Individual Defendants engaged in a discussion of the proposal made by the Blackstone/Providence Consortium and purportedly rejected it. *Thereafter, the Board agreed that it would abandon any efforts to discuss the sale process directly and abdicated all responsibility for any additional "negotiations" to defendant Feld who has existing relationships with certain of the bidders and/or their affiliates and advisors*.

50.     In late September 2006, the Mays Family began working closely together with Blackstone and Providence on finalizing items for the buyout of the Company.

51.     In early October 2006, the Board agreed to retain and caused CCU to pay for separate legal counsel for the Mays Family in connection with negotiations to purchase CCU where the Mays Family was adverse to CCU and its shareholders.

52.     On October 10, 2006, approximately 2 months *after* the Individual Defendants, Providence and Blackstone had been actually engaged in an effort to purchase CCU, the "special advisory committee" engaged the law firm of Sidley Austin LLP as its counsel and Lazard Freres ("Lazard") as its financial advisor.

53.     Also on October 10, 2006, representatives of THL, which expressed its desire to discuss a transaction with the Company, contacted representatives of Clear Channel. Even though the Board and its representatives had been actually engaged in the

process of selling CCU for approximately two months, the Board responded to the THL offer by directing Goldman Sachs to advise THL that the Board had *not* determined that it would sell CCU.

54.     On October 24, 2006, THL submitted an expression of interest to acquire the Company for $35 to $37 per share, and that it could complete its remaining due diligence and other work necessary to enter into definitive agreements for the proposed acquisition within 20 days.

55.     On October 25, 2006, THL requested permission to form a consortium with Bain, and Texas Pacific Group ("TPG") (collectively, the "THL/Bain Group"), in purchasing CCU. This was approved by defendant Feld.

56.     On October 26, 2006, the Mays Family met with the THL/Bain Group in San Antonio, Texas. During this meeting, it was explained to the THL/Bain Group the terms they would have to agree to vis-à-vis the Mays Family if the THL/Bain Group desired to have its interest in acquiring CCU considered in good faith. In this regard, counsel for the Mays Family distributed a summary of senior executive arrangements and a management equity term sheet that the Mays Family was imposing on bidders.

57.     On October 27, 2006, the Board of Directors received a preliminary indication of interest from Apollo Management, L.P. ("Apollo") and The Carlyle Group ("Carlyle"), to acquire all of the Company's outstanding common stock for $36 per share in cash. The indication of interest stated that the Apollo/Carlyle Group had been informed by Goldman Sachs that the Board of Directors requested the submission of fully financed bids on November 10, 2006, and requested the Board of Directors to consider a more extended process.

58.     Also on October 27, 2006, Lazard received, and forwarded to Goldman Sachs, from Cerberus Capital Management ("Cerberus") and Oak Hill Capital Management ("Oak Hill"), an indication of interest to engage in discussions regarding a possible leveraged buyout transaction with the Company.  The indication of interest did not contain a price at which the Cerberus/Oak Hill Group would be interested in completing a transaction.

59.     A special telephonic meeting of the Board of Directors was held on October 28, 2006, at which time the indications of interest received from the Apollo/Carlyle Group and Cerberus/Oak Hill Group were discussed and the Individual Defendants (excluding the Mays Family and McCombs) instructed Goldman Sachs to inform the Apollo/Carlyle Group that if a more definitive and competitive proposal was submitted, the Board of Directors would consider extending the time for submission of bids.  In addition, Goldman Sachs was further directed to contact the Cerberus/Oak Hill Group to determine whether it intended to submit an indication of interest and, if so, to provide a preliminary indication of the valuation it was considering.

60.     At this time, Goldman Sachs took advantage of its position vis-à-vis the 4 groups and confirmed that it would be providing the debt financing to consummate the leveraged buyout of CCU.  Notwithstanding this clear conflict of interest by Goldman Sachs acting as both financial advisor to the board and CCU and providing debt financing to the bidders, the directors authorized Goldman Sachs to provide the debt financing.

61.     On October 29 and 30, 2006, management held a due diligence session by telephone with representatives of the Apollo/Carlyle Group.  Also on October 29, 2006, CCU received a preliminary indication of interest from the Cerberus/Oak Hill Group to

acquire all of the Company's outstanding common stock for a price ranging from $37 to $39 per share. The Cerberus/Oak Hill Group was informed that they would be provided access to management and due diligence materials and were requested to submit a more definitive proposal (including plans for financing) in the next several days. Goldman Sachs was also directed to inform them that if, after they completed preliminary due diligence on the Company and its business, they submitted a more definitive proposal (including plans for financing) that was competitive, the board of directors would look favorably on any request to extend the time for submission of bids.

62.     Between October 30, 2006 and November 10, 2006, the Company and Akin Gump engaged in "negotiations" with Cerberus/Oak Hill regarding a standstill and confidentiality agreement. The defendants' refusal to provide Cerberus/Oak Hill with access to CCU management and due diligence materials when Cerberus/Oak Hill refused to execute the agreement effectively precluded them from submitting an offer for CCU that did not include the massive payments to the Mays Family.

63.     On October 31, 2006, management held a due diligence session in San Antonio, Texas with representatives of Apollo/Carlyle. On November 1, 2006, Apollo verbally submitted to Goldman Sachs a revised preliminary indication of interest to acquire all of the common stock of the Company in an all cash transaction at a price of $35 per share, and informed Goldman Sachs that Carlyle would no longer participate in the process. Following this time, Apollo did not request to participate in any further diligence or indicate any interest to form another consortium or submit a proposal.

64.     During the first two weeks of November 2006, Blackstone/Providence and THL/Bain, their financing partners, representatives and advisors continued to conduct

due diligence.  In addition, the Company, Akin Gump and FCC and antitrust counsel for the Company conducted due diligence on the members of each of the groups, particularly with respect to their investments in other media companies and the markets that such companies operated in and the participation of any non-United States persons in such groups.

65.    On November 3, 2006, the Mays Family caused the "special advisory committee" to retain Watson Wyatt & Company ("Watson Wyatt") as its executive compensation consultant to review the existing change-in-control arrangements for the Mays Family, any proposed settlement of these existing arrangements in conjunction with a change of control of the Company and any proposed new incentive and investment arrangements for management.

66.    On November 8, 2006, THL/Bain informed Goldman Sachs it would not be able to submit a complete bid package on November 10, 2006.  After consulting with defendant Feld, Goldman Sachs informed Blackstone/Providence and THL/Bain that the deadline for submitting the bid packages would be extended just 72 hours.   From November 8, 2006 through November 12, 2006, counsel for the Mays Family and counsel for Blackstone/Providence and THL/Bain continued to negotiate the terms by which the Mayses would participate in management and invest in the post-acquisition corporation.

67.    On November 12, 2006, each group was told by Akin Gump and Goldman Sachs that a viable bid package must include a description of the terms the group was willing to make with respect to the participation of the Mays Family in the post-acquisition corporation.

68.     On November 15, 2006, the groups submitted revised proposals of $36.85 per share by Blackstone/Providence and $37.60 per share by THL/Bain.  In addition, each of the two revised proposals reflected improvements to the terms of the respective proposed merger agreement.   The CCU Board of Directors accepted the proposal submitted by THL/Bain, and the Board approved execution of the merger agreement (the "Merger Agreement").

69.     Following the execution of the Merger Agreement, Goldman Sachs began to contact private equity firms and strategic buyers that might be interested in exploring a transaction with the Company.   Of the 22 parties contacted during the 21-day post-signing "go-shop period," none submitted a proposal to pursue a transaction with the Company.   Accordingly, on December 8, 2006, CCU notified the Buyout Group that CCU had not received any proposals that would qualify as an "Excluded Competing Proposal" for purposes of the solicitation provisions of the Merger Agreement.

**Announcement of the Proposed Transaction**

70.     On November 16, 2006, defendants caused CCU to announce the execution of a definitive merger agreement with an investment group consisting of the Mays Family, THL and Bain, whereby the Buyout Group will acquire CCU in a transaction with a total value of approximately $26.7 billion, including the assumption or repayment of approximately $8 billion of debt.   Under the terms of the agreement, CCU shareholders will receive $37.60 in cash for each share of CCU common stock they own. The Proposed Transaction contains a termination fee of up to $500 million.

71.     The Company issued a release on November 16, 2006, entitled "Clear Channel Communications, Inc. Enters into Merger Agreement with Private Equity Group

Co-Led By Bain Capital Partners, LLC and Thomas H. Lee Partners, L.P." The release

stated:

> Clear Channel Shareholders offered $37.60 per share in cash; Transaction valued at $26.7 billion

> Clear Channel Communications, Inc., a global leader in the out-of-home advertising industry, today announced the execution of a definitive merger agreement with a group led by Thomas H. Lee Partners, L.P. and Bain Capital Partners, LLC, pursuant to which the group will acquire Clear Channel in a transaction with a total value of approximately $26.7 billion, including the assumption or repayment of approximately $8.0 billion of net debt.

> Under the terms of the agreement, Clear Channel shareholders will receive $37.60 in cash for each share of Clear Channel common stock they hold, representing a premium of approximately 25% over Clear Channel's average closing share price of $29.99 during the 30 trading days ended October 24, 2006, the day before the Company first acknowledged that it was evaluating strategic alternatives.

> Morgan Stanley, Citigroup, and Deutsche Bank as well as Credit Suisse, RBS and Wachovia are acting as financial advisors and providing firm financing commitments to the private equity group. Morgan Stanley, Citigroup, Deutsche Bank, Credit Suisse and RBS are also providing equity commitments.

> The board of directors of Clear Channel, with the interested directors recused from the vote, has unanimously approved the merger agreement and has resolved to recommend that Clear Channel's shareholders adopt the agreement. A special advisory committee consisting of disinterested directors unanimously determined the terms of the transaction to be fair.

> Mark P. Mays, the Chief Executive Officer of Clear Channel, said, "We are very pleased to announce this transaction which provides substantial value to our shareholders. We look forward to working with Thomas H. Lee Partners and Bain Capital Partners to continue our business plan to provide exceptional programming to our audiences and value to our advertising partners."

> Scott Sperling, Co-President of Thomas H. Lee Partners, stated, "Clear Channel is one of the nation's truly great companies that has the finest collection of outdoor and radio assets in the industry. We are extremely pleased to be partnered with the management team led by Mark and Randall Mays and to have the opportunity to work with them and to

grow this company that was created by its Chairman and founder, L. Lowry Mays. Clear Channel has tremendous long term growth opportunities in both the radio and outdoor businesses and we look forward to partnering with Mark and Randall to create value in the years ahead."

John Connaughton, a Managing Director at Bain Capital, said, "We are very impressed with Clear Channel's strong management team and the company's leadership positions in a variety of markets and media formats. Clear Channel is an exceptional media franchise that is well-positioned to grow thanks to the solid foundation the Mays family has created. We look forward to partnering with Clear Channel as it continues to innovate in meeting the changing needs of the audiences and advertisers it serves."

The merger does not require the consent of unsecured note holders and is not conditioned upon a merger, consolidation or going private transaction involving Clear Channel Outdoor Holdings, Inc.

The merger is subject to the approval of Clear Channel's shareholders, requisite regulatory approvals and customary closing conditions. Under the merger agreement, Clear Channel may solicit competing bids from third parties through December 7, 2006, and may negotiate with parties that submit competing proposals by that time until January 5, 2007.

Clear Channel may, at any time, subject to the terms of the merger agreement, respond to unsolicited proposals. If Clear Channel accepts a superior proposal, a break up fee would be payable by the Company. There can be no assurance that the solicitation of proposals will result in any alternative transaction.

At the request of the disinterested directors, three members of senior management have agreed to significantly reduce payments that could be payable upon a change of control by an amendment to their employment agreements.

Clear Channel also today announced, by separate press release, that it intends to solicit buyers for 448 radio stations in selected small markets as well as for its television broadcasting division. The merger is not conditioned on the consummation of any of these sale transactions.

Goldman, Sachs & Co. is acting as exclusive financial advisor to Clear Channel and Lazard Frères & Co. LLC is acting as financial advisor to the special advisory committee. Goldman, Sachs & Co. and Lazard Frères & Co. LLC have each delivered a fairness opinion to the Board and special advisory committee, respectively. Akin Gump Strauss Hauer &

Feld LLP is acting as legal advisor for Clear Channel and Sidley Austin LLP is acting as legal advisor for the special advisory committee. Ropes & Gray LLP and Dow Lohnes PLLC are serving as legal advisors to the private equity group.

72.     The Proposed Buyout at $37.60 per share represents a 9.9% premium to CCU's stock price on the last trading day prior to the announcement.

73.     Morgan Stanley, Citigroup, and Deutsche Bank as well as Credit Suisse, RBS and Wachovia are acting as financial advisors and providing firm financing commitments to the private equity group.  Morgan Stanley, Citigroup, Deutsche Bank, Credit Suisse and RBS are also providing equity commitments.  Goldman Sachs will receive in excess of $40 million in fees just for the financial advisory services provided to CCU.

**Insider Benefits**

74.     The Proposed Transaction has been structured to ensure that the Mays Family will continue to run CCU after the consummation of the Proposed Transaction. Defendant L. Mays will continue to serve in the new privately held company, defendant M. Mays will remain as the Company's CEO and defendant R. Mays will remain as President and CFO.   Additionally, unlike plaintiff and the Company's other public shareholders, the Proposed Transaction provides that each member of the Mays Family will be able to invest a portion of their equity stake in CCU alongside THL and Bain. Each member of the Mays Family will also receive significant change-in-control payments in connection with the transaction.

**Defective Process**

75.     The defendants caused the Company has asserted that a "special advisory committee consisting of disinterested directors unanimously determined the terms of the

transaction to be fair." However, neither the "special advisory committee" nor the resulting terms of the Merger Agreement are in fact fair to CCU or its shareholders. Defendants also disclosed that the purportedly independent Board members that reviewed and decided the best alternative for CCU consisted of defendants Feld, Lewis, Riggins, Strauss, Watts, Williams and Zachry. However, these directors are not independent and have acted in the best interest of the Mays Family as opposed to the Company's shareholders. All of the directors were hand-picked to serve on the CCU Board by the Mays Family and, as set forth above, at least four members of the "special advisory committee" have close personal and working relationships with the Mays Family and therefore lack the required objectively and impartiality necessary in order to maximize shareholder value which is a direct violation of their fiduciary duties.

76.     The Individual Defendants rigged the bidding process for the Company so that the Mays Family would own an interest in CCU, and continue to run the Company and earn their generous compensation packages. The Individual Defendants, in breach of their fiduciary duties, failed to seriously consider alternative transactions, including transactions in which the Mays Family would no longer run CCU or a transaction that could result in superior terms.

83.     *The Wall Street Journal* article described the unfair sale process by which the Board favored the Mays Family while considering other proposals, as well as the abbreviated bidding process, noting:

> If and when a final deal comes to a shareholder vote, Clear Channel holders are likely to scrutinize both the board's role and the sales process that it approved. If they perceive that it behaved in a way that forced a particular outcome, they might oppose the transaction.

> A primary issue would be whether the company adequately considered proposals from bidding groups less friendly to the Mays

family. Another key question: Whether the board seriously considered a break-up plan that, at least according to some observers, could fetch more money than if the company were sold in one piece.

*     *     *

Competing bidders had just a short time to get their act together. Clear Channel, which is being advised by Goldman Sachs Group Inc., wanted "best and final offers" by Nov. 10 – a deadline later moved to Nov. 13. That allowed just three weeks for researching and arranging financing for one of the largest media transactions in history.

By comparison, the auction of Spanish-language broadcaster Univision Communications Inc. was announced Feb. 9 and concluded in late June. Crafts retailer Michaels Stores Inc. announced its strategic review in March and signed a private-equity deal on July 1.

After Clear Channel announced the short window for bidding, a number of new faces jumped into the fray, including a private-equity team of Carlyle Group and Apollo Group. A separate team of Cerberus Capital Management and Oak Hill Capital Partners also explored a bid. Both were viewed on Wall Street as being less inclined to keep the Mayses on as managers. The Carlyle Group didn't get far, said one person familiar with the matter, because it considered Clear Channel too expensive.

The Cerberus group was more interested, but it didn't get very far either, says a person familiar with the matter, because it viewed the deal as too complicated to prepare in such a short time.

**Negative Response to the Proposed Acquisition**

77.     Investors have expressed substantial dissatisfaction with the $37.60 per share offer, a mere 10% premium over the closing price of November 15, 2006. Specifically, Stifel Nicolaus stated in a November 16, 2006 report that the shareholders should "reject" the offer. Commenting on the valuation issues, Stifel stated:

> $37.60/share equates to 11.3 x 2007E total EBITDA, and implies only a 10.5x multiple for Radio/Other – too low, in our opinion: The $37.60 buyout offer equates to only 11.3x 2007 EBITDA, below smaller but comparable radio transactions at 13x. In addition, if you place CCO's 11.5x 2007 EBITDA multiple onto CCU's billboard assets, the offer implies CCU's Radio & Other assets are valued at only 10.5x EBITDA – an even bigger discount to comparable transactions. . . .

26

We believe shareholders should reject the initial offer; CCU's assets could command a much higher price if sold piece by piece, in our view: We believe CCU shares are worth more than $37.60 if the company sold its assets by segment, even when using conservative multiple estimates – if Radio is sold for 12x EBITDA, Outdoor for 13x EBITDA, and TV/Other for 11x EBITDA, we get to a $42 share price.

78.     Fred Moran of the Stanford Group in Florida stated that the private equity defendants are "looking to capitalize on an opportunity. . . . They see that media stocks have been pummeled, and perhaps they are speculating that this is the beginning of the recovery."  Mr. Moran was also interviewed on *Bloomberg News* and stated that the market was undervaluing the Company and that the private equity defendants are taking advantage of the value discrepancy and "looking to capitalize on an opportunity."  He further told *Bloomberg News* that private equity is "picking off assets at the bottom."

**Improper Deal Protection Device**

79.     The Merger Agreement contractually limited the Individual Defendants from exercising their fiduciary duty to act in favor of the interests of CCU and its shareholders in soliciting other offers by, among other things, restricting the solicitation of other offers after December 7, 2006, and further limiting the Individual Defendants' ability to negotiate with other parties until January 7, 2007.  These provisions precluded the CCU Board from freely exercising its fiduciary duties, which impediments were in addition to the up to $600 million fee to be paid to the Buyout Group if the Proposed Transaction is not consummated pursuant to §8.02 of the merger agreement.

**The False and Misleading Proxy Statement**

80.     On December 15, 2006, as part of their continuing effort to effectuate the Proposed Transaction, the Individual Defendants caused CCU to file a Proxy Statement with the SEC.  The Proxy Statement purports to disclose the material information about

of the Proposed Transaction necessary to be stated therein.   However, the Proxy

Statement misrepresents and/or omits material facts, including:

        (a)     That the CCU Board did not give good faith consideration to bids

from potential acquirors which would not agree to retain the Mays Family in their senior

management positions and provide them money and a large equity interest in CCU;

        (b)     That the CCU Board believes that the Proposed Transaction "is fair

to and in the best interests of the Company and its unaffiliated shareholders," when, in

fact, the CCU Board does not so believe;

        (c)     That the fairness opinions issued by Goldman and Lazard are each

false and misleading in that they omit and/or misrepresent material facts, such as:

            (i)     The basis for the multiples and discount rates used by

Goldman in its Present Value of Future Stock Price Analysis;

            (ii)     The Company's management forecasts for 2007-2011,

which forecasts were used by Goldman and Lazard in their analyses and the assumptions

underlying the forecasts;

            (iii)     The rationale behind the refusal of Goldman and Lazard to

perform a customary comparable transactions analysis to compare the Proposed

Acquisition to comparable transactions; and

            (iv)     The basis for the discount rates and terminal multiples used

by Lazard in its Discounted Cash Flow Sum-of-the-Parts Analysis;

        (d)     That in order to comply with the Mays Family's wishes, the Board

did not execute a spin-off of Clear Channel Outdoors and/or a program of debt repayment

and/or debt refinancing prior to a transaction to benefit CCU public shareholders instead of the Buyout Group and the Mayses;

(e)   Identification of the "holder" of CCU's restricted shares whose shares will be treated differently in the Proposed Transaction and how they will be treated;

(f)   Whether the Company and/or its advisors went back to Blackstone/Providence as part of the "go-shop" process to ascertain their interest;

(g)   The terms on which defendants and/or CCU executive officers are being permitted to rollover their interests into the post-acquisition entity;

(h)   That portion of the fees due Lazard and Goldman that are contingent on consummation of the Proposed Transaction; and

(i)   Whether Lazard and/or Goldman have performed or expect to perform work for any of the participants in the Buyout Group and/or are involved or expect to be involved in any transaction involving any participant in the Buyout Group and the compensation received from and/or expected to be received from any such work.

81.   The failure to disclose the foregoing information will deprive CCU's public shareholders from making an informed decision on whether or not to approve the Proposed Transaction.  As a result, CCU's shareholders will be forced to vote on the Proposed Transaction without complete and accurate information, and will thereby be effectively deprived of their vote on the Proposed Transaction.

## COUNT I

### Derivative Claim for Violation of §14(a) of the Exchange Act and SEC Rule 14a-9 Against the Individual Defendants

82.    Plaintiff incorporates by reference and re-alleges each and every allegation contained in ¶¶1-81 above as though fully set forth herein.  This Count is asserted derivatively on behalf of CCU against the Individual Defendants.

83.    The Individual Defendants caused CCU to prepare and file the Proxy Statement with the SEC.

84.    The Proxy Statement is false and misleading in that it fails to disclose material facts about the Proposed Transaction.  This disclosure was necessary to make the disclosures that were made not misleading.

85.    The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

86.    The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy Statement and in other information reasonably available to shareholders.

87.    By reason of the foregoing, the Individual Defendants have violated §14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

## COUNT II

### Derivative Claim for Violation of §20(a) of the Exchange Act
### Against the Individual Defendants and the Buyout Group

88.     Plaintiff incorporates by reference and re-alleges each and every allegation contained in ¶¶1-81 above as though fully set forth herein.  This Count is asserted derivatively on behalf of CCU against all defendants.

89.     The Individual Defendants acted as controlling persons of CCU within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of CCU, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.

90.     Pursuant to the terms of the Merger Agreement, the members of the Buyout Group also had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content of the various statements which plaintiff contends are false and misleading.

91.     Each of the defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

92.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to

have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. In addition, as the Proxy Statement sets forth at length, and as described herein, the defendants were all involved in negotiating, reviewing and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered, descriptions which must have had input from both the directors and the members of the Buyout Group. The Proxy Statement at issue contained the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in the making of this document.

93.     By virtue of the foregoing, the Individual Defendants have violated §20(a) of the Exchange Act.

94.     As set forth above, the Individual Defendants and the members of the Buyout Group had the ability to exercise control over and did control a person or persons who have each violated §14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of the defendants' conduct, CCU will be irreparably harmed.

## COUNT III

### Derivative Claim Against the Individual Defendants
### for Breach of Fiduciary Duties

95.     Plaintiff incorporates and re-alleges each and every allegation contained in ¶¶1-81 above as though fully set forth herein. This Count is asserted derivatively on behalf of CCU against the Individual Defendants.

96.     The Individual Defendants have knowingly or recklessly and in bad faith violated fiduciary duties of care, loyalty, good faith, candor and independence required of directors of a public corporation and have acted to put their personal interests, and those of the Mays Family, ahead of the interests of CCU.

97.     By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, knowingly or recklessly and in bad faith are causing injury to CCU.

98.     The Individual Defendants have knowingly or recklessly and in bad faith violated their fiduciary duties by entering into a transaction with CCU without regard to the fairness of the transaction to CCU and by failing to disclose all material information concerning the Proposed Transaction.

99.     As demonstrated by the allegations above, the Individual Defendants knowingly or recklessly failed to exercise the care required and breached their duties of loyalty, good faith, candor and independence owed to CCU because, among other reasons:

(a)     They took steps to cap the value of CCU in any proposed transaction, and to give defendants an unfair advantage by, among other things, failing to properly solicit other potential acquirers or alternative transactions;

(b)     They failed to properly value CCU;

(c)     They ignored or did not protect against the numerous conflicts of interest resulting from the directors' own interrelationships or connection with the Proposed Transaction; and

(d)   They have failed to disclose all material information in the Proxy, which information is necessary to  make the statements made therein not false or misleading in violation of federal law.

100.   By reason of the foregoing acts, practices and course of conduct, defendants have knowingly or recklessly and in bad faith failed to exercise care and diligence in the exercise of their fiduciary obligations toward CCU.

101.   The Individual Defendants are engaging in self-dealing, are not acting in good faith towards CCU, and knowingly or recklessly have breached and are continuing to breach their fiduciary duties owed to CCU.

102.   As a result of the Individual Defendants' unlawful actions, CCU will be irreparably harmed.  Unless the Proposed Transaction is enjoined by the Court, the Individual Defendants will continue to knowingly or recklessly and in bad faith breach their fiduciary duties owed to CCU, will burden CCU with enormous amounts of additional debt to the irreparable harm of CCU and will not engage in arm's-length negotiations on the Proposed Transaction terms, and will not disclose properly and adequately all material information required in connection with the Proposed Transaction.

103.   Plaintiff, on behalf of the Company, has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can plaintiff protect CCU from the immediate and irreparable injury which defendants' actions threaten to inflict on the Company.

## COUNT IV

**Derivative Claim Against the Individual Defendants for Gross Mismanagement**

104.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth in ¶¶1-81 above as though fully set forth herein.   This Count is asserted derivatively on behalf of CCU against the Individual Defendants.

105.    The Individual Defendants had a duty to CCU to prudently supervise, manage and control the operations and business of CCU.

106.    The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of CCU in a manner consistent with the duties imposed upon them by law.   By committing the misconduct alleged herein, the Individual Defendants breached their duties of due care, diligence, and candor in the management and administration of CCU's affairs and in the use and preservation of CCU's assets.

107.    During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused CCU to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to CCU, thus breaching their duties to the Company.   As a result, the Individual Defendants grossly mismanaged CCU.

108.    By reason of the foregoing, CCU has been irreparably harmed.   Only through the exercise of this Court's equitable powers can the Company be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

## COUNT V

### Derivative Claim Against the Individual Defendants for Abuse of Control

109.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth in ¶¶1-81 above as though fully set forth herein.   This Count is asserted derivatively on behalf of CCU against the Individual Defendants.

110.    The Individual Defendants employed the alleged scheme for the purpose of deriving material personal benefits for themselves as part of the Proposed Transaction.

111.    The Individual Defendants' conduct constitutes an abuse of their ability to control and influence CCU.

112.    By reason of the foregoing, CCU has been irreparably harmed.   Only through the exercise of this Court's equitable powers can the Company be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

## COUNT VI

### Class Claim Against the Individual Defendants
### for Breach of Fiduciary Duties

113.    Plaintiff incorporates by reference and re-alleges each and every allegation contained in ¶¶1-34 and 44-81 above as though fully set forth herein.

114.    Plaintiff brings Counts VI-VII on its own behalf and on behalf of all other public stockholders of the Company (except defendants herein and any persons, firm, trust, partnership, corporation, or other entity related to, or affiliated or acting in concert with them and their successors in interest), who are or will be threatened with injury arising from defendants' wrongful actions alleged herein (the "Class").

115.    This Count is properly maintainable as a class claim for the following reasons:

(a)     The Class is so numerous that joinder of all members is impracticable.   As of November 6, 2006, there were issued and outstanding over 493 million shares of CCU common stock held by hundreds, if not thousands, of beneficial holders scattered throughout the country.

(b)     There are questions of law and fact which are common to the Class including, *inter alia*, the following:

(i)     whether a so-called "Special Advisory Committee" appointed by the CCU Board was truly independent;

(ii)     whether the Individual Defendants have breached their fiduciary duties of undivided loyalty, independence or due care with respect to plaintiff and the other members of the Class in connection with the Proposed Transaction;

(iii)     whether the Mays Family are attempting to unjustly enrich themselves and other insiders or affiliates of CCU;

(iv)     whether the Individual Defendants, as the control persons of CCU, have breached and are breaching their fiduciary duties to CCU's shareholders by attempting to consummate the Proposed Transaction pursuant to an unfair process;

(v)     whether the Individual Defendants have breached any of their other fiduciary duties to plaintiff and the other members of the Class in connection with the Proposed Transaction, including the duties of candor, good faith, and fair dealing;

(vi)     whether the failures and omissions to disclose in the Proxy Statement violate Texas law; and

(vii)     whether plaintiff and the other members of the Class would suffer irreparable injury were the transaction complained of herein consummated.

(c)     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class, and plaintiff has the same interests as the other members of the Class.  Accordingly, plaintiff is an adequate representative of the Class who will fairly and adequately protect the interests of the Class.

(d)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

(e)     Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, preliminary and final injunctive relief on behalf of the Class as a whole is entirely appropriate.

121.     The Individual Defendants have knowingly or recklessly and in bad faith violated the fiduciary duties of care, loyalty, good faith, candor and independence owed to the public shareholders of CCU and have acted to put their personal interests ahead of the interests of CCU's shareholders.

122.     By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, knowingly or

recklessly and in bad faith are attempting to unfairly deprive plaintiff and other members of the Class of a fair sale process.

123.    The Individual Defendants have knowingly or recklessly and in bad faith violated their fiduciary duties by entering into a transaction with CCU without regard to the fairness of the transaction to CCU's shareholders and by failing to disclose all material information concerning the Proposed Transaction to such shareholders.

124.    As demonstrated by the allegations above, the Individual Defendants knowingly or recklessly failed to exercise the care required and breached their duties of loyalty, good faith, candor, and independence owed to the shareholders of CCU because, among other reasons:

(a)     They failed to take steps to avoid capping price of CCU's stock and/or giving defendants an unfair advantage by, among other things, failing to properly solicit other potential acquirers or alternative transactions;

(b)     They ignored or did not protect against the numerous conflicts of interest resulting from the directors' own interrelationships or connection with the Proposed Transaction; and

(c)     They have failed to disclose all material information about the Proposed Transaction.

125.    Because the Individual Defendants, and in particular, the members of CCU who are part of the Buyout Group, dominate and control the business and corporate affairs of CCU, and are in possession of private corporate information concerning CCU's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of CCU

which makes it inherently unfair for them to pursue any Proposed Transaction wherein they will reap disproportionate benefits to the exclusion of maximizing stockholder value.

126.   By reason of the foregoing acts, practices and course of conduct, defendants have knowingly or recklessly and in bad faith failed to exercise care and diligence in the exercise of their fiduciary obligations toward plaintiff and the other public shareholders of CCU.

127.   Unless enjoined by this Court, the Individual Defendants will continue to knowingly or recklessly and in bad faith breach their fiduciary duties owed to plaintiff and the other public shareholders of CCU, and may consummate the Proposed Transaction which will exclude plaintiff and the other public shareholders from their fair share of CCU's valuable assets and businesses, and/or disproportionately benefit these defendants in the unfair manner complained of herein, all to the irreparable harm of the Class.

128.   The Individual Defendants are engaging in self-dealing, are not acting in good faith toward plaintiff and the other members of the Class, and knowingly or recklessly have breached and are continuing to breach their fiduciary duties to the members of the Class.

129.   As a result of the Individual Defendants' unlawful actions, plaintiff and the other members of the Class will be irreparably harmed in that they will not receive their fair portion of the value of CCU's assets and businesses and will be prevented from obtaining the real value of their equity ownership of the Company.  Unless the Proposed Transaction is enjoined by the Court, the Individual Defendants will continue to knowingly or recklessly and in bad faith breach their fiduciary duties owed to plaintiff

and the members of the Class, will not engage in arm's-length negotiations on the Proposed Transaction terms, and will not supply to CCU's minority stockholders sufficient information to enable them to receive an accurate Proxy Statement and thereby cast an informed vote on the Proposed Transaction, all to the irreparable harm to the members of the Class.

130.    Plaintiff and the members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

## COUNT VII

### Class Claim for Aiding and Abetting Breaches of Fiduciary Duty
### Against the Buyout Group

131.    Plaintiff incorporates by reference and re-alleges each and every allegation contained in ¶¶1-34 and 44-81 above as though fully set forth herein.  Plaintiff brings this Count on its own behalf and on behalf of all other public stockholders of the Company (except defendants herein and any persons, firm, trust, partnership, corporation, or other entity related to, or affiliated or acting in concert with them and their successors in interest), who are or will be threatened with injury arising from defendants' wrongful actions alleged herein.

132.    The Buyout Group aided and abetted the Individual Defendants in breaching their fiduciary duties owed to the public shareholders of CCU, including plaintiff and the members of the Class.

133.    The Individual Defendants owed to plaintiff and the members of the Class certain fiduciary duties as fully set out herein.

134.     By committing the acts alleged herein, the Individual Defendants breached their fiduciary duties owed to plaintiff and the members of the Class.

135.     The Buyout Group colluded in or aided and abetted the Individual Defendants' breaches of fiduciary duties, and was an active and knowing participant in the Individual Defendants' breaches of fiduciary duties owed to plaintiff and the members of the Class.

136.     The Buyout Group participated in the breach of the fiduciary duties by the Individual Defendants for the purpose of advancing its own interests.  The Buyout Group will obtain both direct and indirect benefits from colluding in or aiding and abetting the Individual Defendants' breaches via the acquisition.

137.     Plaintiff and the members of the Class shall be irreparably injured as a direct and proximate result of the aforementioned acts.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands relief, in plaintiff's favor and in favor of CCU and the Class, respectively, and against defendants, as follows:

A.     Declaring that Counts VI and VII are properly maintainable as class claims;

B.     Declaring and decreeing that the Proposed Transaction was entered into in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable;

C.     Enjoining defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until a procedure or is adopted and implemented to obtain the highest possible price for shareholders;

D.     Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction which is in the best interest of CCU's shareholders until the process for the sale or auction of the Company is completed and the highest possible price is obtained;

E.     Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof;

F.     Imposition of a constructive trust, in favor of plaintiff, upon any benefits improperly received by defendants as a result of their wrongful conduct;

G.     Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

H.     Granting such other and further equitable relief as this Court may deem just and proper.

DATED: January **11**, 2007                    PROVOST & UMPHREY LAW FIRM, LLP

_Joe Kendall_
_____
JOE KENDALL

State Bar No. 11260700
WILLIE BRISCOE
State Bar No. 24001788
HAMILTON LINDLEY
State Bar No. 24044838
3232 McKinney Avenue, Suite 700
Dallas, TX  75204
Telephone:  214/744-3000
214/744-3015 (fax)

LERACH COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
RANDALL J. BARON
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff Alaska Laborers Employers
Retirement Fund

BROWER PIVEN
A Professional Corporation
DAVID A.P. BROWER
ELIZABETH A. SCHMID
488 Madison Avenue
Eighth Floor
New York, NY  10022
Telephone: 212/ 501-9000
212/ 501-0300 (fax)

HARWOOD FEFFER LLP
ROBERT HARWOOD
SAMUAL ROSEN
488 Madison Avenue
New York, New York 10022
Telephone: 212/ 935-7400
212/753-3630 (fax)

ZIMMERMAN, LEVI & KORSINSKY, LLP
EDUARD KORSINSKY
39 Broadway, Suite 1601
New York, NY  10006
Telephone:  212/363-7500
212/363-7171 (fax)

S:\CptDraft\Derivative\Cpt Clear Channel-Deriv (DJR version).DOC

VERIFICATION

I, JOE KENDALL, hereby declare as follows:

1.      I am a member of the law firm of Provost & Umphrey Law Firm, LLP, one of the counsel for plaintiff in the above-captioned action.  I have read the foregoing complaint and know the contents thereof.  I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.      I make this Verification because plaintiff is absent from the County of Dallas where I maintain my office.

Executed this 10th day of January, 2007 at Dallas, Texas.


_____
JOE KENDALL